## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JODY JOHNSON, *et al.*,

      Plaintiffs,

vs.                                          Civ. No. 99-00348 MV/WWD-ACE

CITY OF HOBBS, a municipality,

      Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion by Plaintiffs and the Class of All African-American Residents of Hobbs for Sanctions and Further Relief to Obtain Compliance with the Stipulated Agreement, filed February 7, 2003 **[Doc. No. 135]**.  The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the motion is well-taken and will be **GRANTED in part**.

### BACKGROUND

On March 29, 1999, Plaintiffs filed this case on behalf of themselves and all persons similarly situated, alleging that Defendants violated their rights to be free from unreasonable and excessive searches, arrests and uses of force, and that Defendants discriminated against them on the basis of their race.  The parties subsequently entered into a Stipulated Agreement Resolving All Class and Individual Claims for Injunctive Relief ("Stipulated Agreement").  The Stipulated Agreement included both the payment of monetary damages to the named Plaintiffs and various forms of injunctive relief against Defendant City of Hobbs in favor of the class and the named Plaintiffs.

On February 7, 2003, Plaintiffs and the Class of All African-American Residents of Hobbs filed a Motion for Sanctions and Further Relief to Obtain Compliance with the Stipulated Agreement asserting that Defendant had failed to comply with numerous provisions in the Stipulated Agreement.  Plaintiffs seek, in part, compliance with the provisions of the Stipulated Agreement, extension of the term of the Stipulated Agreement, modification of the Stipulated Agreement, sanctions against Defendant, replacement of the Internal Affairs Officer, disciplinary actions against certain police officers, and attorney's fees and costs.

## DISCUSSION

**I.    Violations of the Stipulated Agreement**

**A.    Relevance of Incidents Involving Non-Class Members**

Plaintiffs allege that Defendant has violated a number of provisions of the Stipulated Agreement.   In support of this assertion, Plaintiffs rely, in part, on a number of incidents involving Hispanic citizens.  Defendant contends that Plaintiffs, who represent the Class of All African-American Citizens of Hobbs, have no standing to present the alleged claims of any non-class members.  Defendant misunderstands the relevance of the evidence provided by Plaintiffs.

The Stipulated Agreement requires certain processes and procedures designed to safeguard the rights of all citizens of Hobbs.  These procedures are to be followed in every case, not just cases involving African-Americans.  Consequently, the fact that the procedures were not followed in any situation is relevant to Plaintiffs' allegations that Defendant has not complied with the terms of the Stipulated Agreement.  Plaintiffs are not pursuing claims on behalf of Hispanics; rather, Plaintiffs are pursuing their rights to have Defendant comply with the Stipulated Agreement.  Similarly, the fact that some of the citizens involved in the incidents cited by

Plaintiffs have filed suit against Defendant does not preclude the use of these incidents as evidence

that the Stipulated Agreement has been violated.

B.      **Section X:  Racial Bias Analysis**

Section X of the Stipulated Agreement provides that:

HPD [Hobbs Police Department] senior officers will conduct systemic analyses on
a quarterly basis for each officer to detect trends in potential racial bias with the
goal of eliminating actions that reflect racial bias.  This analysis should include a
review for each officer of:  1) statistics by race in uses of force, field contacts,
other detentions, searches and seizures, and citizen's complaints, 2) the use of
racial epithets and 3) other indicators of possible racial bias.  If these data show
disparate racial impact, use of racial epithets or improper conduct, HPD will
immediately refer the data to the IA Officer for investigation and subsequent
remedial/disciplinary action by the Chief of Police or the City Manager, as
appropriate.

Stipulated Agreement, § X.

Plaintiffs assert, and Defendant does not contest, that HPD did not even begin to analyze

racial data until October 2002, approximately 16 months after the Stipulated Agreement was

entered.  Furthermore, it appears that HPD still does not compile or analyze individual officer use

of force by race and individual officer searches by race as required by Section X.

The data that is compiled by HPD show that African-American citizens are being arrested,

subjected to force and subjected to investigative detentions in numbers significantly greater than

their percentage in the community.  According to the 2000 Census, African-Americans constitute

approximately 6.8% of the population of Hobbs.[1]  The data compiled by HPD for the time period

from the 3rd quarter of 2001 to the 3rd quarter of 2002 show that the percentage of African-

Americans subjected to field interviews and arrests averaged 15.1% and 16.4%, respectively,

---

[1]  This is the number both parties rely upon in their respective analyses.

while the percentage of African-Americans subjected to arrests for the discretionary offense of "Resisting, Evading, Obstructing an Officer," averaged 21.1%.

HPD data also suggests that certain HPD officers may have engaged in patterns of conduct that have a disparate impact on class-members and other minority citizens.  For example, during this same time period, Officers Cunningham, Tubbs and McCall arrested African-Americans in numbers three to four times greater than their percentage in the community; Officers McCall, Lasater and Gronewald subjected African-Americans to Field Interview stops in numbers four to five times greater than their percentage in the community; and some individual officers' arrest rates of African-American were as high as 37%.[2]  These numbers, on their face, demonstrate a disparate racial impact that should have triggered Section X's requirement that HPD refer the data to the Internal Affairs Officer for investigation and subsequent remedial/disciplinary action by the Chief of Police or the City Manager, as appropriate.

Defendant asserts that these numbers do not demonstrate a disparate racial impact because it is a fact that blacks commit crimes at a rate in excess of their population in the community.  In support of this assertion, Defendant cites to a study by Gary LaFree, a professor of Sociology at the University of Maryland in the Department of Criminology and Criminal Justice, that was prepared in connection with another racially disparate policing suit against HPD.  Mr. LaFree randomly chose ten cities of similar size to Hobbs and conducted a study of arrest rates of black citizens versus non-back citizens for the years 1997-1998.  Mr. LaFree determined that the ten cities in his study arrested black citizens six times more frequently than non-black citizens while

---

[2]  Approximately 28% of Officer McCall's arrests, 25% of Officer Tubb's arrests, 37% of Officer Wright's arrests, 22% of Officer McKean's arrests, 18% of Officer Dunlap's arrests and 15% of Officer Gronewald's arrests for this time period were of African-Americans.

Hobbs only arrested black citizens two times more frequently than non-blacks during this period. Thus, Mr. LaFree concluded that the arrest rate of blacks in Hobbs was not a function of disparate policing by HPD, but, rather, was a function of the behavior of black citizens.    While the Court is unpersuaded by Mr. LaFree's methodology and conclusions, the Court need not address these issues because Mr. LaFree's study is irrelevant to the issue before the Court.  The question before the Court is whether Defendant is complying with the terms of the Stipulated Agreement.  The Stipulated Agreement requires Defendant to analyze certain data and, if this analysis shows a disparate racial impact, to refer the data to the Internal Affairs Officer for investigation and subsequent remedial/disciplinary action by the Chief of Police or the City Manager, as appropriate.  The statistics prepared by Defendant plainly show a disparate racial impact and should have triggered an Internal Affairs investigation.  Only at that point are explanations for the disparate racial impact relevant.  As Defendant did not refer the data to the Internal Affairs Officer for investigation, Defendant's purported justification for the disparity is irrelevant to whether Defendant complied with the terms of the Stipulated Agreement.

Defendant's argument that the fact that certain arrests of black citizens allegedly decreased after the Stipulated Agreement went into effect is "definite and concrete evidence that the City of Hobbs is squarely in compliance with the terms of the stipulated agreement" is similarly misguided.  Even assuming Defendant's assertion regarding the decrease in arrests of black citizens is accurate, a decrease in arrests is not evidence that Defendant is complying with the terms of the Stipulated Agreement.  The Stipulated Agreement requires certain processes and procedures designed to reduce disparate policing.  While a reduction in the rate of arrests of minority citizens may be the result of compliance with these procedures, it does not, by itself,

have any bearing on whether Defendant is complying with the Stipulated Agreement.

Finally, Defendant argues that Plaintiffs' reliance on quarterly data is improper and statistically invalid.  While the analysis of data from a single quarter of data may be insufficient to establish trends, the Stipulated Agreement specifically requires the analysis of data on a quarterly basis and, accordingly, Plaintiffs' citation to quarterly data is not improper.

The Court finds that Defendant's failure to perform the required analysis of policing data and failure to refer data indicating a disparate racial impact to the Internal Affairs Officer for investigation constitutes a violation of Section X of the Stipulated Agreement.

### C.      Sections VI(B) & (C):  Investigative Detentions

Section VI(B)(1) requires HPD officers to submit a report every time they conduct a warrantless search or seizure, including all investigative detentions allegedly authorized under *Terry v. Ohio*, 392 U.S.1 (1968):

> B.      Within one month the HPD will modify its policies, procedures and forms regarding reports on field interviews, detentions, searches and seizures as follows:
>
> 1.      All officers will be required to complete a written report each time an officer performs a search without a warrant, seizes any property without a warrant (excluding towing vehicles and found or unclaimed property not on a person, in a vehicle or on property otherwise being searched), or conducts an investigative detention based on suspicion of criminal activity (that is, a detention authorized by *Terry v. Ohio*, 392 U.S. 1 (1968)).
>
> 2.      This report will include at least:  the case # (if applicable); the officer's name; a description of the incident; the specific type of detention, search, or seizure; the reason for the detention, search, or seizure; whether the subject was asked to consent to any search; whether the subject was offered a written consent form to sign and the subject's response to such request; whether the subject granted consent; whether the contact was tape recorded; the name, race, and gender of all persons involved in the detention, search, or seizure; any weapon, evidence, or contraband found; whether the individual involved in the detention, search, or seizure was arrested or cited, and if so, the charges; date, time, and

location of the incident.  If a consent form was signed, it shall be attached to the report and if consent was tape recorded, the tape shall be placed into evidence and maintained for 60 days.

Stipulated Agreement, § VI (B).

Section VI (B)(6) provides that each report "will be reviewed by Internal Affairs and the reporting officer's immediate supervisor within 24 hours. . . .  Whenever Internal Affairs or a supervisor determines that the officer's conduct reasonably indicates a possible violation of HPD policies or other inappropriate conduct, Internal Affairs will then conduct a proper investigation." Stipulated Agreement, § VI (B)(6).

Section VI(C) of the Stipulated Agreement requires HPD senior staff to analyze and review these reports and, if necessary, take remedial steps to ensure that officers are using appropriate methods during detentions, searches, and seizures:

C.      Quarterly, on a cumulative basis, HPD senior staff will analyze and review these reports in order to strengthen HPD's ability to prevent improper detentions, searches, and seizures by all officers.  As part of this analysis and review, senior staff will specifically:

1.      have compiled and review incidents by officer and by type of detention, search, or seizure used.

2.      Take remedial steps sufficient to ensure that officers are using appropriate methods during detentions, searches, and seizures.  Such steps may include, but are not limited to, revision of policy or training generally or remedial instruction to assure that individual officers do not inappropriately make detentions, searches, and seizures in the future.

Stipulated Agreement, § VI (C).

Plaintiffs have identified six instances in which class members or other minorities were subjected to non-consensual investigative detentions but no field interview cards or reports were filed.  Furthermore, Plaintiffs assert, and Defendant does not contest, that HPD detectives do not

-7-

file field interview cards when they detain citizens who are not subsequently arrested, apparently because the Stipulated Agreement only requires "officers" to complete field interview cards. While the term "officer" is not defined by the Stipulated Agreement, the Court finds that the common usage of the term encompasses detectives and, therefore, both HPD officers and HPD detectives are subject to the terms of the Stipulated Agreement.

Defendant's failure to require HPD officers and detectives to file a complete written report each time an officer performs a search without a warrant, seizes property without a warrant, or conducts an investigative detention based on suspicion of criminal activity is a violation of Section VI. Failure to file written reports for every covered incident skews the statistics on the racial effects of policing in Hobbs and prevents Plaintiffs from effectively monitoring and enforcing the rights and obligations under the Stipulated Agreement.

In addition, Plaintiffs have identified numerous field interview cards which, on their face, lack reasonable suspicion for a non-consensual detention. These cards include detentions for "coming out of an alley after dark," walking down the street at 7:30 a.m. carrying a cordless drill, "suspicious activity," and walking down the street in a "high burglary area." On May 2, 2002, Captain Graham wrote a memo to other HPD officers informing them that he had met with all three Field Services Lieutenants regarding the fact that some of the Field Interview cards failed to demonstrate the reasonable suspicion required by law and that vague reasons being listed on the cards were not acceptable.

While HPD, to its credit, recognized that either there were illegal detentions being made or a deficiency in the information contained in the field interview reports, there is no indication that Internal Affairs or any HPD supervisors determined that the officers who conducted these

detentions without articulating reasonable suspicion had committed  "a possible violation of HPD policies or other inappropriate conduct" and referred these matters to Internal Affairs for an investigation in accordance with Section VI(B)(6) of the Stipulated Agreement.  Failure to refer field interview cards that lack a showing of reasonable suspicion to Internal Affairs for investigation constitutes a violation of Section VI(B)(6).

Defendant asserts, without any support, that these interview cards show reasonable suspicion but that "the wording could have and should have been more detailed."  The Court disagrees.  On their face, the interview cards cited above plainly lack a showing of reasonable suspicion.  While the officers may have had the requisite reasonable suspicion for the detentions, reasonable suspicion is not evident from the face of the interview cards, suggesting a possible violation of HPD policies or other inappropriate conduct that should have triggered an investigation by Internal Affairs.

Plaintiffs also provide other HPD records that reveal potential improper police conduct that should have been investigated under Sections VI(B) and (C) of the Stipulated Agreement.  For example, on August 31, 2002, the alleged shooter in an incident was seen handing a gun to a male who began walking towards 409 and 407 E. Alston.  Detective Coburn ordered Officer Gronewald to detain any persons in the area of 407 and 409 E. Alston as possible suspects in a shooting.  Pursuant to this order, Officer Gronewald detained Manuel Muro, who had driven to 407 Alston to pick up his niece and nephew, as well as five other individuals, on the sidewalk for nearly six hours while the police obtained a warrant to search the two houses.  HPD reports contain no evidence that there was any probable cause, or reasonable suspicion, to believe Manuel Muro was involved in any crime being investigated--Mr. Muro's name does not appear in any of

the reports relating to the robbery and shooting that were being investigated and he did not live at either residence.  Despite this apparently illegal detention, neither Officer Gronewald's supervisor nor the Internal Affairs Officer found any "possible violation of HPD policies or other inappropriate conduct" when they reviewed the report.  Consequently, no internal affairs investigation was conducted of this incident.  In addition, it does not appear that any reports were filed regarding the detention of these citizens, in violation of Section VI(B)(1-3) of the Stipulated Agreement.  Notably, Defendant does not address the merits of this detention, stating only that Mr. Muro is not a class member and Plaintiffs have no standing to allege any injury as a result of Mr. Muro's detention.

In another incident cited by Plaintiffs, HPD received an anonymous call that Christian Hodge had burglerized a neighbor's home and carried jackets from the neighbor's home to the home he shared with his mother, Verna Hodge.  On the basis of this anonymous tip, and without speaking to the alleged victim to confirm a crime had been committed, three HPD officers entered the Hodge home without a warrant and, allegedly without consent,[3] and detained Verna Hodge and three other persons in the Hodge home for approximately an hour and a half while HPD officers attempted to obtain a search warrant to look for the allegedly stolen items.  A search warrant was never obtained.[4]  The officers involved did not prepare written reports on any of the

_____

[3] Defendant contends that entry into the home was with Ms. Hodge's obvious consent: Ms. Hodge "opened the door and stepped back, and based upon this apparent invitation Officers walked inside."

[4] The Court finds it very disturbing that despite the fact that no charges were ever brought against Christian Hodges, Defendant's brief repeatedly states that Christian Hodge committed a felony crime.  In addition, Defendant complains that Ms. Hodge had the "audacity" to file a citizen complaint regarding the allegedly unlawful entry and detention:  "Her son had just committed a felony, and had victimized her neighbor Ms. Trevino, and Mrs. Hodge has the

citizens detained at the house, in violation of Section VI(B)(1-3).  Furthermore, the investigation

of the citizen complaint filed by Verna Hodge and another person detained was not completed

within 30 days as required by Section VIII(D)(5)(e) of the Stipulated Agreement.

In a third incident cited by Plaintiffs, a search warrant was obtained which authorized a

search of 621 ½  E. Scharbauer for a shotgun, a .22 caliber pistol, and ammunition.  An

Oldsmobile owned by Luis Ruiz had been driven to 621 ½ E. Scharbauer by his son, Joel Ruiz.

The vehicle was not mentioned in any HPD report as having been involved in the shooting under

investigation and Joel Ruiz was not mentioned as a possible suspect.  Luis Ruiz's car was

searched and no weapons or ammunition were found.  HPD did, however, seize a leafblower,

ninety compact discs, three guitar amplifiers, three tool boxes, and numerous other tools that Mr.

Ruiz kept in his car.  None of these items was covered by the search warrant or connected to the

shooting under investigation.  HPD also seized Mr. Ruiz's only set of car keys and left the vehicle

at 621 ½ Scharbauer.  Mr. ruiz was not given written notice that his property had been taken and

was not provided an opportunity to contest the seizure.  *See, e.g., City of West Covina v. Perkins*,

525 U.S. 234, 240-41 (1999).  Despite the apparent unlawfulness of the search and seizure, HPD

supervisors did not refer the matter to Internal Affairs for investigation, in violation of Sections

VI(B) & (C).

Plaintiffs cite a number of additional incidents they allege should have triggered an Internal

Affairs investigation.  The Court need not consider the remaining incidents because the evidence

---

audacity to only be concerned about the police . . . Mrs. Hodge was apparently totally unfazed by
the fact that her son had just committed a felony crime."  Defendant's comments raise questions
regarding Defendant's understanding of, and commitment to protecting, the Constitutional rights
of the citizens of Hobbs.

cited above is sufficient to demonstrate a material breach of Section VI of the Stipulated Agreement.

### D.    Section V:  Excessive Use of Force

Section V of the Stipulated Agreement addresses "use of force" by HPD officers.  Section V(A) requires all officers to complete a written report regarding "uses of force."  These reports are to be reviewed by supervisors and "[i]f a use of force reasonably indicates a possible violation of HPD policy or other inappropriate conduct, the immediate or any other supervisor will refer the matter directly to Internal Affairs for investigation."  Section V(F).  The Stipulated Agreement also requires HPD senior staff to:

1.    analyze use of force data on a quarterly, cumulative basis to detect trends in department use of force,

2.    have compiled in writing and review use of force incidents by officer and by type of force used, and

3.    review these data for the purpose of identifying and acting upon their implications for policy and training designed to ensure that officers are using only appropriate types and amounts of force.

Stipulated Agreement, § V (H).

Plaintiffs contend that HPD use of force data and reports indicate inappropriate use of force that should have been referred to Internal Affairs for investigation.  Plaintiffs allege that during a fifteen month period, Officer McCall used force on at least 27 occasions, Officer Lasater used force on 23 occasions, and Officer Kim used force on 18 occasions.  Defendant points out that the number of times an officer uses force may be misleading because each officer is required to note a use of force incident for each type of force used and for each subject present.  Thus, a single arrest may result in the filing of two, three, or more incidents of use of force.  Defendant

-12-

maintains that the proper question is whether the use of force was justified in the situation.

HPD supervisors noted the number of times Officers McCall, Lasater and Kim had used force during the 2nd Quarter of 2002 but found that there was "no reason for alarm," and referred to these officers as "top performing officers."  There was no analysis of whether the use of force was justified in the situation.  Defendant's analysis of the use-of-force data is inadequate to demonstrate that this data does not indicate a potential problem.  At a minimum, HPD needs to elaborate on, and provide support for, its conclusions regarding this data.  Furthermore, Defendant admits that prior to the third quarter of 2002, over a year after the Stipulated Agreement was entered, the reason for the use of force was not included in the data.  It is difficult to imagine that HPD could fulfill its obligation under the Section V(H) to review use of force data "to ensure that officers are using only appropriate types and amounts of force" without knowing the reason for the use of force.

Plaintiffs also contend that the use of force reports reveal improper uses of force that should have resulted in referrals to Internal Affairs for investigation pursuant to Section V(F).  In support of this contention, Plaintiffs submit two use of force reports.[5]  In one report, an officer handcuffed a woman who had been involved in an argument with two men and had her sitting on the curb.  When the woman attempted to stand up from the curb, the officer struck her on the tibia and broke her leg.  In the second report, an officer was conducting a routine traffic stop in front of a home when the occupant of the home, Mr. Benavidez, approached the vehicle, with his

---

[5]  Defendant did not supply the Court with responses to these incidents because none of the incidents involved a class member.  As discussed above, the Stipulated Agreement provides processes and procedures to be applied in all situations.  Therefore, a violation of the Stipulated Agreement occurs when these processes and procedures are not followed regardless of the race of the citizen involved.

hands in his pockets, and spoke to the person in the passenger seat of the vehicle.  The officer

ordered Mr. Benavidez to remove his hands from his pockets.  When Mr. Benavidez did not

comply with this request and began to walk away, one officer held Mr. Benavidez's arm while

another officer "distracted him with a knee strike to his right lateral femoral nerve" as well as

other physical contact.  Mr. Benavidez was hospitalized for pain in his ribs, buttock and genital

areas.  Neither one of these reports was referred by HPD to Internal Affairs even though the

information on the face of the documents "reasonably indicates a possible violation of HPD policy

or other inappropriate conduct."  Failure to refer these reports to Internal Affairs for an

investigation violated Section V(F) of the Stipulated Agreement.

### E.      Section VIII:  Citizen Complaints

The Stipulated Agreement requires a comprehensive revision of HPD's citizen

complaint/internal affairs processes.  As part of this revision, Internal Affairs must identify for

review by the Chief and designated supervisors, "all officers with three or more complaints of

misconduct or other Internal Affairs referrals in three years."  Stipulated Agreement, § VIII

(D)(7)(E).  "These reviews should result in supervisory meetings with the officer, retraining,

counseling, assignment to a field-training officer, transfer, and/or reassignment, as appropriate at

the discretion of the Chief."  *Id.*

During the first twelve months after the entry of the Stipulated Agreement, HPD did not

even attempt to comply with this provision, even though numerous officers had three or more

complaints within the prior three year period.  In fact, from July 2001 to September 2002,

Officers Wilkison, Kim, Lasater, Shaw, Luna, McCall and Gronewald were the subject of at least

63 citizen complaints.

In the 3rd Quarter of 2002, HPD began issuing complaint review letters to the lieutenants of officers who had three or more complaints within a one-year time period.  This action, while a start, is insufficient to comply with the Stipulated Agreement.  The Stipulated Agreement requires reviews of officers with three or more complaints in a three-year time period, not in a single year. Furthermore, the Stipulated Agreement requires a review, not simply a letter regarding the number of complaints against particular officers.  Defendant has not provided any evidence that the requisite reviews have taken place or that any remedial actions have been taken.

Plaintiffs also provide evidence they believe shows that Defendant has failed to investigate citizen complaints in conformance with the provisions of the Stipulated Agreement.  In July 2001, a citizen complaint was made by Gloria Mora on behalf of her 15-year-old daughter, Jolene, and her 12-year-old son, Michael.  Ms. Mora claimed Officers Lasater and Dunlap arrested Jolene without probable cause and used excessive force by assaulting Michael with a chemical spray.  The facts of this incident are not disputed.  The officers came to the Mora home to investigate a complaint that Michael had thrown eggs at a car.  Jolene, who was home alone with Michael and a friend of Michael's, answered the door.  The officers, without advising the children of their right not to answer questions, began questioning Jolene and Michael regarding the alleged egg-throwing. Both Jolene and Michael denied that Michael had thrown any eggs.  When the officers continued questioning Michael and his friend, Jolene told her little brother and his friend that they did not have to, and should not, answer any more questions.  Officer Lasater then handcuffed and arrested Jolene for "Obstructing an Officer" because she "intentionally advised" her brother not to answer any further questions.

Internal Affairs Officer Johnny Gonzales investigated the complaint and, without

addressing the First Amendment issue, found that "Jolene obstructed the investigation by telling Michael and Hector they did not have to talk to the officers" and  Ms. Mora's complaint was dismissed as "unfounded."  Mr. Gonzales' finding was reviewed and approved by HPD Chief Knott and City Attorney, Joan McMahon.  The New Mexico Civil Liberties Union wrote to Chief Knott, asserting that the arrest violated Jolene's First Amendment rights and requesting that Defendant reconsider the findings.  Defendant declined to reconsider.

It is well-established law that the First Amendment prohibits the arrest of a citizen for verbal statements to a police officer unless those statements rise to the level of fighting words. *See, e.g., Chaplinsky v. State of New Hampshire*, 315 U.S. 568 (1942).  There is no evidence or allegations that Jolene Mora's statements to her brother and his friend rose to the level of "fighting words."  Plaintiffs' assert that HPD's approval of the unlawful arrest of Jolene Mora raises serious concerns regarding HPD's willingness, or ability, to adequately investigate citizen complaints and comply with the Constitution and laws.

The Stipulated Agreement requires certain processes and procedures designed to reduce disparate policing.  While an illegal arrest may result in a violation of the Stipulated Agreement if the proper reporting, review and remedial processes are not followed, the illegal arrest itself is not a violation of the Stipulated Agreement.  The Court shares the Plaintiffs' concerns regarding Defendant's failure to identify what appears to be a clear Constitutional violation in the arrest of Jolene Mora, however, the investigation and review performed by Defendant substantially complied with the terms of the Stipulated Agreement.  While the Stipulated Agreement does not provide a remedy for illegal conduct, a separate action against HPD can be, and apparently was, brought to assert the alleged violations of Ms. Mora's Constitutional rights.

-16-

Section XI(B) requires Defendant to promptly provide Plaintiffs with copies of citizen complaint summaries and public reports.  Plaintiffs have provided several complaint summaries which, on their face, fail to consider the factors required by the Stipulated Agreement, including the officer's complete history of complaints.  Defendant has refused to provide complete copies of citizen complaint files, however, so it is impossible for Plaintiffs, or the Court, to determine if Defendant has complied with the citizen complaint provisions of the Stipulated Agreement.

Section XI(E) provides that HPD will provide Plaintiffs' designee with any information reasonably requested regarding compliance with this Stipulated Agreement.  Plaintiffs have demonstrated that complete copies of citizen complaint files are necessary to determine if Defendant has complied with the citizen complaint provisions of the Stipulated Agreement and the Court will order Defendant to provide this information upon request.

### F.    Section VIII(D)(3)(a):  Tort Claims

Section VIII(D)(3)(a) requires the Internal Affairs Officer to investigate all potential misconduct allegations, including the filing of tort claims.  Plaintiffs contend, and Defendant does not dispute, that HPD has not investigated all tort claim notices that have been filed over the past 18 months, in violation of Section VIII(D)(3)(a).

### G.    Sufficiency of Internal Affairs investigations

Plaintiffs raise concerns regarding the sufficiency of the Internal Affairs investigations that are being conducted.  Plaintiffs cite to the investigation of Officer Kim.  On July 17, 2002,  Joe Danny Castillo filed a citizen complaint against Officer Kim and Officer Vanvalkenburg in which he alleged that Officer Kim had harassed him and used excessive force on him and that Officer Vanvalkenburg had acted unprofessionally in making disparaging remarks in the course of an

investigation.  Approximately one month later, Officer Kim arrested Joe Danny Castillo on a

warrant out of Carlsbad for a "Joe M. Castillo" whose birth date and social security number

differed from Joe Danny Castillo's and who was described as having numerous tatoos while Joe

Danny Castillo had none.   Internal Affairs investigated the incident and concluded that Officer

Kim had falsely arrested Mr. Castillo.

Plaintiffs assert that Internal Affairs failed to investigate the obvious question of whether

Officer Kim's arrest of Mr. Castillo was in retaliation for Mr. Castillo's citizen complaint.

Defendant, however, has submitted an affidavit from Johnny Gonzales, the Internal Affairs officer

who conducted the investigation.  In this affidavit, Mr. Gonzales asserts that he did investigate the

possibility that the false arrest was in retaliation for Mr. Castillo's citizen complaint.  On the

evidence before it, the Court finds that Plaintiffs have not demonstrated that  Internal Affairs

investigations are inadequate.

As discussed above, copies of citizen complaint files, including the investigation by

Internal Affairs of these complaints, are necessary to determine if Defendant has complied with

the citizen complaint provisions of the Stipulated Agreement and, pursuant to Section XI(E),

must be produced upon request.  Production of this information should assist Plaintiffs in

determining if Internal Affairs investigations comport with the terms of the Stipulated Agreement.


### H.      Role of Monitor

The Stipulated Agreement required Defendant to engage the services of Clarence

Chapman as an independent monitor/mediator:

Within ten days of the agreement on this Stipulated Agreement, HPD will engage

the services of Clarence Chapman as the independent monitor/mediator for a period of three years.  The independent monitor/mediator shall:

1.    Receive, review, comment on and make recommendations concerning drafts of all new and/or revised policies, practices and regulations required by this Stipulated Agreement,

2.    Receive, review, comment on and make recommendations concerning arrests, detentions, searches and seizures, and racial bias on the basis of statistics, analyses and documents provided in connection with the implementation of this Stipulated Agreement,

3.    Review, comment on and make recommendations concerning citizen's complaints and investigations thereon,

4.    Review, comment on and make recommendations concerning training in the areas covered by this Stipulated Agreement,

5.    Assess progress; mediate differences between the parties about implementation of this Stipulated Agreement and file periodic reports, and

6.    Provide Plaintiffs' designee with copies of all letters, recommendations, etc. made in this case.

Stipulated Agreement, § XI (A).

Plaintiffs assert that Mr. Chapman has failed to adequately perform his duties under the Stipulated Agreement and, as a result, Plaintiffs have been denied the benefits of the Stipulated Agreement.  The Court has reviewed Plaintiffs' assertions regarding the alleged deficiencies in the performance of Mr. Chapman, and, as a whole, finds them to be without merit.

First, Plaintiffs assert that Mr. Chapman has failed to issue timely reports and recommendations.  The Stipulated Agreement does not specify a time period for the performance of Mr. Chapman's review, comment and recommendation duties.  The Court finds that a time lag of a few months from the provision of the data to the issuance of Mr. Chapman's comments and recommendations is acceptable.  Second, Plaintiffs complain that Mr. Chapman's reports are not

issued on a regular basis.  The Stipulated Agreement requires Mr. Chapman to issue "periodic" reports.  Over the three-year span of the agreement, Mr. Chapman has issued four detailed reports.  The Court finds that this satisfies the requirement of "periodic" reports.

Plaintiffs also complain about the level of analysis performed by Mr. Chapman.  The Stipulated Agreement does not require that Mr. Chapman perform an in-depth analysis on every piece of data provided to him.  The reports issued by Mr. Chapman are sufficiently detailed to satisfy the requirements under the Stipulated Agreement.

Much of Plaintiffs' discontent is with the substance of Mr. Chapman's opinions and recommendations.  Whether the Court, or the Plaintiffs, disagree with the substance of Mr. Chapman's comments and recommendations, however, is irrelevant.  The evidence before the Court indicates that Mr. Chapman substantially performed his duties under the Stipulated Agreement.

## II.    Remedy

The Court finds that the violations of the Stipulated Agreement identified above constitute a material breach of the Stipulated Agreement that has deprived Plaintiffs of an essential purpose of the contract--the implementation of certain processes and procedures devised to safeguard the rights of all citizens of Hobbs.  The remaining issue before the Court, therefore, is the appropriate remedy for Defendant's noncompliance.

Plaintiffs seek, in part, certain modifications to the Stipulated Agreement as well as sanctions against Defendant.  The Court has no authority to grant Plaintiff's requested relief.  The Court retained jurisdiction to enforce the Stipulated Agreement. Retaining jurisdiction to enforce a settlement agreement, however, is not enough to transform a settlement agreement into a

-20-

consent order subject to modification by the Court.  *See D. Patrick, Inc.  v. Ford Motor Co.*,

8 F.3d 455, 461 (7th Cir. 1993)).  "Standing alone, a settlement agreement is nothing more than a

contract; the imprimatur of an injunction is required to render it a consent decree."  *Consumers*

*Gas & Oil, Inc. v. Farmland Industries, Inc.*, 84 F.3d 367, 370 (10th Cir. 1996) (quoting *D.*

*Patrick*, 8 F.3d  at 460).  The Stipulated Agreement does not have the requisite judicial

imprimatur to be a consent decree.[6]  Consequently, the Court must construe the Stipulated

Agreement in the same manner as a contract to determine how it should be enforced.  *See, e.g.,*

*Republic Resources Corp. v. ISI Petroleum West Caddo Drilling Program 1981*, 836 F.2d 462,

465 (10th Cir.1987) (settlement agreement is construed in the same manner as a contract to

determine how it should be enforced).

       Under New Mexico law, the Court has no authority to modify the unambiguous terms of a

contract.  "In the absence of ambiguity, a court must interpret and enforce the clear language of

the contract and cannot make a new agreement for the parties."  *Nearburg v. Yates Petroleum*

*Corp.*, 1997-NMCA-069, ¶ 23, 943 P.2d 560, 569;  *see also CC Housing Corp. v. Ryder Truck*

*Rental, Inc.*, 746 P.2d 1109, 1111 (1987) ("[T]he court's duty is confined to interpreting the

contract that the parties made for themselves, and absent any ambiguity, the court may not alter

or fabricate a new agreement for the parties.").  The Court can interpret and enforce the

unambiguous terms in the Stipulated Agreement but may not modify these terms or impose

sanctions for violating these terms.

---

      [6]  The Court's jurisdiction to enforce the Stipulated Agreement and the reasons the
Stipulated Agreement does not have the requisite judicial imprimatur to be a consent decree are
set forth in the Memorandum Opinion and Order denying Defendant's Motion to Enforce the
Stipulated Agreement Resolving All Class and Individual Claims for Injunctive Relief and Motion
to Stay, filed April 6, 2004, **[Doc. No. 172]**.

Plaintiffs have provided evidence that Defendant has repeatedly violated numerous requirements of the Stipulated Agreement.  The Court appreciates that it was difficult to implement all the provisions of the Stipulated Agreement in a timely fashion and accepts Mr. Chapman's representation that HPD has been in substantial compliance for the last two quarters.  However, Defendant was required to substantially comply with the Stipulated Agreement for the entire three-year period.  While the Court may not modify the terms of the Stipulated Agreement, the Court does have the authority to extend the term of the Stipulated Agreement.  Due to Defendant's substantial non-compliance for a significant portion of the term of the Stipulated Agreement, the Court will extend the term of the Stipulated Agreement for one year.

**CONCLUSION**

**IT IS THEREFORE ORDERED** that the Motion by Plaintiffs and the Class of All African-American Residents of Hobbs for Sanctions and Further Relief to Obtain Compliance with the Stipulated Agreement, filed February 7, 2003, **[Doc. No. 135]** is hereby **GRANTED in part** as follows:

1.      The term of the Stipulated Agreement shall be extended for 12 months.  If Mr. Chapman is unavailable, or unwilling, to continue in the role of  monitor, the parties shall meet and select a mutually agreeable monitor.  The 12 month term will begin to run from the date a monitor is selected.

2.      The term "officer" as used in the Stipulated Agreement includes both HPD officers and HPD detectives.

3.      Defendant shall promptly provide complete files on citizen complaints to Plaintiffs' designee upon request.

4.      Attorney's fees and costs are hereby awarded to Plaintiffs.  Plaintiffs have 30 days from the date of this Order to submit a properly documented

-22-

petition for attorney's fees and costs.


Dated this 14th day of June, 2004.


_____
MARTHA VÁZQUEZ
U. S. DISTRICT COURT JUDGE


Attorney for Plaintiffs:
      Richard Rosenstock, Esq.
      Daniel Yohalem, Esq.

Attorney for Defendant:
      Josh A. Harris, Esq.